UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SHANTEL EVANS                                              CIVIL ACTION

VERSUS                                                            NUMBER: 17-00376

NANCY A BERRYHILL, ACTING                       SECTION: "J"(5)
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the

Court on the parties' cross-motions for summary judgment following a decision of the

Commissioner of the Social Security Administration denying Plaintiff's applications for

Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits

based upon disability.  (Rec. docs. 16, 17).

On March 26, 2014, Shantel Evans, Plaintiff herein, protectively filed an application

for DIB, alleging disability as of July 1, 2009.  (Tr. pp. 178-179).  She subsequently filed an

application for SSI benefits on May 6, 2014, alleging disability as of the same date that was

set forth in her DIB application.  (Tr. pp. 180-185).  In a "Disability Report-Adult" form that

appears in the administrative record below, the conditions limiting Plaintiff's ability to work

were identified as PTSD, severe depression, bipolar disorder, obesity, anxiety, and attention

deficit disorder.  (Tr. pp. 198-206).  Plaintiff's applications for Social Security benefits were

denied at the initial level of the Commissioner's administrative review process on September

10, 2014.  (Tr. pp. 130-133).  Although the administrative record contains a request for

reconsideration of the initial denial that was submitted by Plaintiff on November 12, 2014 (tr. p. 136), it does not contain a definitive ruling on that request. Nevertheless, on November 12, 2014, Plaintiff contacted the Administration and requested a hearing *de novo* before an Administrative Law Judge ("ALJ"). (Tr. pp. 45-46). That hearing went forward on August 5, 2015 at which Plaintiff (who was represented by counsel), Plaintiff's friend/roommate, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 47-107). On November 16, 2015, the ALJ issued a written decision in which he concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 11-27). The Appeals Council ("AC") subsequently denied Plaintiff's request for review of the ALJ's decision on November 22, 2016, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-6). It is from that unfavorable decision that the Plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In her cross-motion for summary judgment, Plaintiff initially frames the issues for judicial review as follows:

1. Whether the Administrative Law Judge had a complete record to make a determination of compensability or whether there is a need for a remand?

2. Whether the evidence submitted supports a granting of benefits?

(Rec. doc. 16-1, p. 3).

However, in the "Law and Argument" portion of her supporting memorandum, Plaintiff frames the issues for judicial review in the following fashion:

A. Evidence could not be considered which would have changed the outcome of the determination.

B. Plaintiff meets the Listings of Appendix 1 to Subpart P.

C. Plaintiff is not suited for substantial gainful activity.

2

(Rec. doc. 16-1, pp. 4, 6, 10).

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

1. The claimant met the insured status requirements of the Social Security Act through March 31, 2011.

2. The claimant has not engaged in substantial gainful activity since July 1, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments:  Major Depressive Disorder with psychotic features and borderline personality traits (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  [t]he claimant can perform simple routine tasks; occasional interaction with the public, supervisors and coworkers; and no frequent changes in the work setting.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on July 1, 1990 and was 19 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. pp. 16, 17, 18, 21, 22, 23).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries:   (1) whether substantial evidence of record supports the Commissioner's decision and (2) whether the decision comports with relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1970). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983).  The Court may not reweigh the evidence or try the issues *de novo*, nor may it substitute its judgment for that of the Commissioner.  *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act.  *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir.

1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A).  Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled.  *Harrell*, 862 F.2d at 475.  In making this determination, the Commissioner uses the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings;

2. An individual who does not have a "severe impairment" will not be found to be disabled;

3. An individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors;

4. If an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made; and,

5. If an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 2294 n. 5 (1987).  If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other

similar evidence to establish that such jobs exist.  *Fraga*, 810 F.2d at 1304 (citing *Lawler v. Heckler*, 761 F.2d 195, 198 (5th Cir. 1985)).  Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding.  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Fraga*, 810 F.2d at 1302.

As noted earlier, one of the challenges made by Plaintiff in this matter is that the ALJ, at step three of the §§404.1520/416.920 analysis, failed to find that her condition satisfied the criteria of one of those set forth in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  At step three, the ALJ found that Plaintiff's "… impairments do no[t] singularly or in combination meet or medically equal the required criteria for Listing[s] 12.04, 12.06, 12.08 or any other listed impairment."  (Tr. p. 17).  At the time of the administrative proceedings below,[1/] the first Listing cited by the ALJ, Listing 12.04, provided that a claimant would be presumptively deemed to be disabled if she suffered from the following:

> *Affective Disorders*:  Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
> A.  Medically documented persistence, either continuous or intermittent, of one of the following:
> 1.  Depressive syndrome characterized by at least four of the following:
>   a.  Anhedonia or pervasive loss of interest in almost all activities; or
>   b.  Appetite disturbance with change in weight; or
>   c.  Sleep disturbance; or
>   d.  Psychomotor agitation or retardation; or
>   e.  Decreased energy; or
>   f.  Feelings of guilt or worthlessness; or
>   g.  Difficulty concentrating or thinking; or
>   h.  Thoughts of suicide; or

---

[1/] The version of Listing 12.04 that was quoted by Plaintiff in her cross-motion for summary judgment did not go into effect until January of 2017.  Similarly, Listing 12.15, which is relied upon by Plaintiff later in her motion, did not go into effect until that same month.

        i.   Hallucinations, delusions, or paranoid thinking; or

2.   Manic syndrome characterized by at least three of the following:
    a.   Hyperactivity; or
    b.   Pressure of speech; or
    c.   Flight of ideas; or
    d.   Inflated self-esteem; or
    e.   Decreased need for sleep; or
    f.   Easy distractability; or
    g.   Involvement in activities that have a high probability of painful consequences which are not recognized; or
    h.   Hallucinations, delusions or paranoid thinking; or

3.   Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B.   Resulting in at least two of the following:
    1.   Marked restriction of activities of daily living; or
    2.   Marked difficulties in maintaining social functioning; or
    3.   Marked difficulties in maintaining concentration, persistence, or pace; or
    4.   Repeated episodes of decompensation, each of extended duration;

OR

C.   Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
    1.   Repeated episodes of decompensation, each of extended duration; or
    2.   A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
    3.   Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

As can be seen, Listing 12.04 consists of an introductory statement describing the specified disorder(s), followed by paragraph "A" medical findings and paragraph "B" impairment-related functional limitations.  As used in paragraph "B," the term "marked" means more than moderate but less than extreme and may arise when several activities or

functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the individual's ability to function independently, appropriately, effectively, and on a sustained basis.  Section 12.00(C), 20 C.F.R. Pt. 404, Subpt. P, App. 1.

The Regulations also define the first two categories of impairment-related functional limitations set forth in paragraph "B" of Listing 12.04 as follows:

1.  *Activities of daily living* include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.  In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability.  We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function.  For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

2.  *Social functioning* refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.  Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers.  You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation.  You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities.  We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity.  Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function.  For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local storekeepers, we may

nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts.

> Section 12.00(C)(1) and (2),
> 20 C.F.R. Pt. 404, Subpt. P,
> App. 1.

The introductory comments to the Section 12.00 Listings further provide that the existence of a medically determinable mental impairment must be established through evidence from an acceptable medical source.  Section 12.00(D)(1)(a), 20 C.F.R. Pt. 404, Subpt. P, App. 1.  However, information from other professional health care providers, such as psychiatric nurses and social workers, and even family members and friends, is typically of great value in assessing a claimant's functionality and the longitudinality of impairment severity.  Section 12.00(D)(1)(c).  To that end, the Regulations specifically speak of the "[n]eed for longitudinal evidence" as being "vital" to proper assessment of the level of functioning and impairment severity over time.   Section 12.00(D)(2).   Notably, the Regulations emphasize that "[c]hronic mental impairments" create "[p]articular problems … in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication," specifically cautioning that "[t]he results of a single examination may not adequately describe … [a claimant's] ability to function."  Section 12.00(E).

In finding that Plaintiff's condition did not satisfy the criteria of any of those set forth in the Listing of Impairments, the ALJ in this case entirely bypassed the paragraph "A" medical findings and proceeded directly to the paragraph "B" and "C" requirements, opining as follows:

> In activities of daily living, the claimant has mild restriction.  She has no difficulty with self-care [Ex 3F/4].  The claimant drives and she can cook and shop for herself.  The claimant provides care for her children.

In social functioning, the claimant has moderate difficulties. She reported that she gets along with people but she does not like when people tell her what to do [Ex 3F/4]. Sometimes she listens and sometimes she does not. She lives with a friend and she has five friends who live in Richmond, which she keeps in contact by telephone.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant has a lengthy psychiatric history including mental health treatment with medication, counseling, and multiple psychiatric hospitalizations [Ex's 1F/13, 2F/11, 9F].

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

(Tr. pp. 17-18).

In making his findings in the paragraph "B" domains of activities of daily living and social functioning, the ALJ cited and relied upon what was filed in the administrative record as a one-page exhibit, "3F/4." That cited exhibit is actually the second page of the report of a one-time consultative psychological evaluation that was performed by Dr. William Fowler on August 11, 2014. (Tr. p. 355). As reported by Dr. Fowler on the noted page, Plaintiff, who was then 24 years of age, identified her mental problems as "severe depression, anxiety, and another … [doctor] said I'm bipolar," relating that "when I get overwhelmed I tend to cut myself. I cry a lot. Trouble sleeping, anger." (*Id.*). Those problems had been going on since she was age 16, with mental health treatment commencing around that time for episodes of running away from home, overdosing, and attempting suicide. Plaintiff was at the time of

the evaluation seeking out a new psychiatrist, having been seen by an unidentified one at an unidentified facility the previous month as she was "new to the area." Plaintiff indicated that her medications were working "OK" and that she had no troubles when she was taking them. (*Id.*).

Socially, Plaintiff reported that she got along with people "OK" and generally did not get in fights or arguments with others but disliked it when people told her what to do so she would just listen and not follow the instruction or suggestion. Criminal history was denied, as were alcohol and drug use. Plaintiff was not employed at the time of the evaluation, having last worked at a Popeye's part-time as a cashier in 2009 for two or three years. In terms of daily activities, Dr. Fowler's report indicates that Plaintiff and her two children lived with a friend of hers and subsisted on government assistance. Finances were managed with difficulty as expenses exceeded savings. Plaintiff reported to the doctor that she had no difficulty with self-care and that she drove, cooked, and shopped for herself. When queried as to whether her mood affected her self-care, Plaintiff responded that "if I'm depressed I tend not to do anything ... when I don't take any medicine ... I don't know how often that is." (*Id.*). She essentially spent the day taking care of her daughters. (Tr. p. 354). Notwithstanding the "history of self-mutilation" as reflected in an April 2014 discharge summary that had been provided to the doctor in advance of his evaluation and Plaintiff's self-injurious tendencies as quoted on the second page of his report, at the time of the evaluation he indicated that Plaintiff "... denies thoughts of harming herself or others." (Tr. pp. 355, 354). Later, in the "mental status" portion of his report, Dr. Fowler spoke to Plaintiff's functionality as follows:

> She can generally understand but not retain simple instructions today. Effort is brief and persistence is weak. The claimant presents as euthymic today. She

> reports a lengthy psychiatric history but reports that on her current medications she does not have significant problems. Unfortunately she seems to take the medications unreliably. She reports a history of responding poorly to stress and may be prone to deterioration. She seems capable of performing simple, repetitive tasks for at last short times today. She may prove somewhat unreliable over extended times due to fluctuating moods however, and she may do best in slow paced settings as she reports being unmotivated by time limits and prefers to work at her own pace.

(Tr. pp. 354, 356).

Dr. Fowler's diagnostic impressions were: major depressive episode, recurrent and moderate with psychotic features which responds well when Plaintiff took her medications; borderline personality traits; and, medication noncompliance issues. (Tr. p. 356).

As noted above, of the medical records that were extant at the time of his evaluation, Dr. Fowler had been provided for his review only one, an April 8, 2014 discharge summary from the Savoy Medical Center in Mamou, Louisiana. That summary and the records relating to the admission that preceded it will be discussed more fully below. Among the other records that pre-dated Dr. Fowler's consultative evaluation were those from the Daily Planet Health Center for the Homeless ("DPHCH") in Richmond, Virginia, where Plaintiff was followed for depressive psychosis, recurrent episodes, for at least six months in 2012. On May 21, 2012, Plaintiff, who was then 21 years of age, presented to DPHCH in need of continued medication management, having been last treated by Dr. Niazzi from July to December of 2011. Plaintiff reported a history of psychiatric care and being on-and-off medication since the age of 15. A history of being raped by a babysitter as a child and by another relative was also reported. Previous psychiatric hospitalizations in 2008 for an overdose of Amoxicillin were followed by further in-patient stays in 2006 and November of 2011. Precipitating events leading to the most recent admission were the passing of Plaintiff's mother and the removal of her three children, of three different fathers, by Child

Protective Services ("CPS").  Plaintiff related feeling OK on her medication regimen which she wished to remain on to comply with the Department of Social Services in a bid to regain custody of her children, two of whom had special needs.  She reported mild anxiety symptoms and nightmares and that Risperdal was helpful in controlling "voices."  Despite a decreased appetite, Plaintiff had experienced a recent gain in weight.  On physical examination, Plaintiff was described as unkempt with a cooperative but yet childlike attitude.  The assessment was depressive psychosis, recurrent episodes.  Plaintiff was maintained on Risperdal, Celexa, Wellbutrin, and Hydroxyzine.  (Tr. pp. 417-418).  By June 18, 2012, Plaintiff's condition had become more stable.  Trazodone was added to her medication regimen.  (Tr. pp. 415-416).  No changes were reported on August 13, 2012.  (Tr. pp. 413-414).  Plaintiff's medications were reconciled on October 17, 2012.  (Tr. p. 412),

On May 21, 2013, Plaintiff presented to The Wellness Group Youth & Family Services Clinic in Richmond as part of the CPS referral to address what was described as "… significant impairments in her social, emotional, and occupational functioning arising from symptoms of depression and anxiety."  Those symptoms included feelings of sadness, hopelessness, crying spells, racing thoughts, and diminished interest in completing all daily activities.  Involvement with CPS had been ongoing since 2010 when "… all three of her children were removed from the home due to severe impairments in her ADL functioning regarding hygiene, cleaning, and providing proper care for her children" who were subjected to "… unsanitary living conditions and unhealthy parenting skills."  By this time, two of Plaintiff's children had been returned to her "… with the exception of the youngest child who remain[ed] in foster care due to pervasive health issues that require[d] frequent attention."  The three fathers of Plaintiff's three children provided no support for her or their offspring,

her mother had passed away in 2012, and Plaintiff remained estranged from her father who was incarcerated.  She was characterized as "socially isolated" and the two social workers who generated the report from this date rated her as having severe impairments in activities-of-daily-living ("ADL") skills, independent living skills, parenting skills, interpersonal skills, and family dynamics.  The severe impairment in ADL skills was attributable to "... poor eating and sleeping habits and lack of motivation to maintain cleanliness of her residence and provide adequate care for her children."  Independent living skills were impaired as a result of Plaintiff "... being unemployed, lack of transportation, and limited income."  The social workers also noted Plaintiff's inability to control her anger, irritability, anger outbursts, and destruction of her own property.  The impairment in parenting skills was evidenced by Plaintiff allowing her young children to self-maintain and an inability to provide a clean living environment.

At the time of the assessment, Plaintiff presented with a disengaged parenting style while waiting in the hospital for treatment of her three-year old's urinary tract infection, allowing the child to urinate on the hospital floor and removing a dirty diaper and attempting to throw it on the floor.  Concern was also raised over Plaintiff's inability to change the child's diaper in a timely manner when wet or soiled.  On mental-status examination, Plaintiff was described as having poor hygiene and being unkempt, displaying pressured speech with little insight concerning her behavior and the consequences of her actions.  Suicide was thought of at the time.  The assessment was bipolar I disorder, most recent episode manic and severe without psychotic features, and a GAF of 45.[2]  Plaintiff exhibited a "history of

[2] A GAF of 41-50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessive rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job.)" *Castillo v. Colvin*, No. 12-CV-3512, 2014 WL 897798 at *5 n. 2 (S.D. Tex. Mar. 5, 2014).

imprudent decisions, poor judgment, and suicidal behavior meriting frequent hospitalizations." She also reported impulsive behavior, increased sexual activity with at least seven different male partners in a week, and a diminished need for sleep congruent with a manic episode, sleeping for about an hour of time daily. Suicide had been attempted via self-starvation and overdosing on prescription medications and Plaintiff had at one time been accused of attempting to stab her mother, an incident that she described as an "accident." (Tr. pp. 365-376).

In a Monthly Progress Report from The Wellness Group dated June 27, 2013, it was noted that Plaintiff had made minimal progress toward her treatment goals. Despite attending counseling sessions three to four times per week, she had made minimal to minimal/moderate progress in stabilizing her mental health, improving parenting skills, and improving ADLs and independent living skills. Scheduling problems continued to be present as were medication noncompliance and loss issues and poor stability in mood and demeanor from session to session. It was recommended that Plaintiff continue with mental-health services and psychiatric care. (Tr. pp. 377-378). Despite such ongoing care and treatment, by July 27, 2013, Plaintiff still had made minimal to minimal-to-moderate progress to her goals and had exhibited self-harm and suicidal ideation in the preceding 30 days. In terms of parenting skills, Plaintiff had demonstrated improper care for her children in hygiene, feeding, attending to their medical needs, and managing their behavior. Plaintiff was at that time under a court order to participate in a Feeding Clinic hosted by the VCU Children's Hospital as a condition to seeking visitation for her daughter who remained in foster care. It was again recommended that Plaintiff continue to participate in mental-health services 7-10 hours per week as well as continued psychiatric care. (Tr. pp. 379-380).

The record contains no monthly progress reports from The Wellness Group for the months of August or September 2013. In a report dated October 27, 2013 which covered the preceding 30-day period, the attending social worker indicated that Plaintiff had made minimal progress in reaching her treatment goals as her level of engagement varied based on her mood or energy level. Plaintiff's psychiatrist was then under investigation for medical malpractice and it was proving to be a challenge to find her a new doctor. She had by that time made the decision to put her youngest daughter up for adoption. However, because Plaintiff had not attended the Feeding Clinic in over a month, she had not been afforded weekend visitation with the youngest child. Although her house was generally cleaner, there were times when it relapsed into disorder and Plaintiff exhibited poor eating habits such as skipping meals. Despite having extremely limited income, Plaintiff had also set the unrealistic goal of purchasing a car without fully grasping the expenses associated with insurance, gas, and maintenance. Continued mental-health treatment was recommended, particularly given the transition to a new psychiatrist and the possibility of new or different medications/doses. (Tr. pp. 381-382).

Plaintiff underwent a reassessment at The Wellness Group on November 7, 2013, relating that she oscillated between symptoms of mania, including periods of elevated energy, lack of sleep, and racing thoughts, and feelings of depression manifested by sadness, hopelessness, crying spells, and lack of motivation. At the time of the reassessment, Plaintiff had not slept in the previous two days. She denied suicidal ideations but continued "… to use cutting behaviors as a coping skill." Plaintiff's involvement with CPS continued as did her struggles with adult living skills including hygiene and cleanliness of the home, parenting skills, and mood stabilization. The adoption of her youngest child was to be formalized in

February of 2014. Aside from her outpatient therapist and her counselor, Plaintiff had no real support system in place. Although she continued to attend outpatient therapy, symptoms of depression persisted along with promiscuity and anger outbursts involving throwing things and hitting walls, episodes that had not decreased significantly. Medications at the time were Celexa, Wellbutrin, Risperdal, Hydroxyzine, Adderall, and Xanax. Poor hygiene was evidenced by unkempt hair and soiled sweatpants and Plaintiff's home was marked by dirt on the floors and dirty laundry in the living room. The diagnostic impressions included bipolar I disorder, most recent episode manic and severe without psychotic features; CPS involvement, risk of hospitalization, and unsanitary housing conditions; and a GAF of 50. It was recommended that Plaintiff continue with mental-health support on an average of 7-10 hours per week. (Tr. pp. 383-386).

On the same date as the reassessment, Plaintiff's counselor at The Wellness Group completed a separate form by which Plaintiff remained eligible for continued mental health services. There, the counselor checked off the appropriate boxes on the form to indicate that Plaintiff had significant functional impairments in major life activities that affected her ability to remain stabilized in the community; that she had difficulty in establishing and maintaining normal interpersonal relationships to such a degree that she was at risk of hospitalization, homelessness, or isolation from social support; that she required help with basic living skills to such a degree that health or safety was jeopardized; that she had exhibited such inappropriate behavior that repeated interventions by mental health, social services, or the judicial system were necessary; and, that she had difficulty with cognitive behavior such that she was unable to recognize personal danger or significantly inappropriate social behavior. In the narrative portion of the form the counselor noted that

Plaintiff "... continues to engage in self-harm (cutting) behavior by cutting her wrists with scissors or 'anything that will cut' when her emotions get intense," a history of four to five psychiatric hospitalizations due to suicide attempts and ideations, and continued struggles with adult daily living skills and cleanliness evidenced by unsanitary living conditions and an inability to attend to her children's dirty diapers in a timely manner.  Plaintiff also continued to report active promiscuity to include a different sex partner on a nightly basis, conduct she could not explain.  (Tr. pp. 387-389).

On November 22, 2013, Plaintiff was admitted to the CJW Medical Center in Richmond, Virginia, complaining of suicidal ideations by overdose, as well as paranoia and hallucinations, after being without medication for some time in the wake of her psychiatrist's apparent suspension from the practice of medicine.  By the time of her initial interview, Plaintiff no longer reported suicidal ideations but stated that she heard voices that were essentially her own thoughts telling her that she was a "bad person."  Plaintiff's most recent hospitalization had been in November of 2011.  Following her admission, Plaintiff was continued on Wellbutrin, Celexa, Risperdal, and Vistaril, with Ativan and Haldol being added as needed as well as Macrobid for a urinary tract infection.  Plaintiff progressed well after the admission and was discharged on November 25, 2013 with a diagnosis of schizoaffective disorder, a urinary tract infection, asthma, and obesity.  She was referred to the Richmond Behavioral Health Authority for outpatient mental health services.  (Tr. pp. 297-313).

On November 27, 2013, The Wellness Group issued a Quarterly Progress Report in which it was indicated that in the previous 90 days, Plaintiff had made minimal progress toward maintaining mental-health stability, improving parenting skills, improving independent living skills, or actively participating in discharge planning.  In the counseling

sessions that had taken place, Plaintiff demonstrated unstable moods, appearing friendly and jovial one day and angry and detached the next.  Although there was a noticeable improvement in her appearance, she still engaged in inappropriate behavior such as writing checks when insufficient funds were present in her account to cover the draft.  Given the lack of progress Plaintiff had achieved, she was continued in the care of The Wellness Group.  (Tr. pp. 390-392).

That brings the Court to the medical records that were generated at the Savoy Medical Center in April of 2014, including the discharge summary that had been provided to and was mentioned by Dr. Fowler in his consultative evaluation report of August 11, 2014.  On April 3, 2014, Plaintiff's family members transported her to the Savoy Medical Center Emergency Room with concerns about the possibility of suicide and she was involuntarily admitted to that facility per a physician's emergency certificate.[3/]  Plaintiff was described as a 23 year-old individual with a history of bipolar disorder, PTSD, and numerous psychiatric hospitalizations in Virginia who had recently moved in with her aunt in Louisiana.  Since that time, she had experienced episodes of feeling depressed and suicidal, being extremely overwhelmed with her children and the move and not taking her medications for a few days. Upon initial evaluation, Plaintiff presented as disheveled and overweight with low energy, lack of motivation, and no desire to do anything.  She acknowledged being depressed and having thoughts of suicide with no present plan; attempts in the past had included cutting herself or overdosing on medications.  Mental-status examination revealed a depressed mood, constricted affect, and speech of decreased rate, tone, and volume.  Plaintiff appeared very guarded and nervous with poor eye contact, some paranoia, and reports of hearing

---

[3/] *See* LSA-R.S. 28:53.

voices telling her negative remarks along with thoughts of suicide.  Her insight/judgment were impaired, memory/concentration were fair, cognition appeared limited, and intellect was estimated to be average to below average.  The admission diagnoses were as follows: Axis I – bipolar/depressed, recurrent, severe with psychosis and a history of PTSD; Axis II – deferred; Axis 3 – obesity; Axis 4 – moderate to severe psychosocial stressors with medication compliance issues and other family stressors; and, Axis 5 – a current GAF of 20 to 25.[4/]  The prognosis was fair and the estimated length of Plaintiff's admission was five to seven days.

Upon admission, Plaintiff was placed on suicide precautions and her medications were increased; "as needed" medications were also ordered.  Within several days, she reported feeling better with almost no auditory hallucinations and improving symptoms of depression.  Plaintiff was ultimately discharged in guarded condition on April 8, 2014, with the discharge diagnoses the same as the one upon admission except that Plaintiff's GAF score had reportedly increased to 80-85.  (Tr. pp. 323-351).  As noted above, it was the foregoing discharge summary from the records of the Savoy Medical Center that had been provided to Dr. Fowler in advance of his consultative evaluation of August 11, 2014.

At the administrative hearing that was held on August 5, 2015, Plaintiff testified to being sexually abused as a child for two years as well as being physically abused at the hands of her mother and another individual.  She also testified to hearing voices on a daily basis and six or more past suicide attempts.  If she did not take her prescribed medications,

---

[4/] "A GAF of 21-30 denotes that a person's [b]ehavior is considerably influence[d] by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all days, no job, home, or friends).'" *Castillo*, 2014 WL 8987798 at *5 n. 2.

Plaintiff tended to isolate and to become withdrawn but when she was compliant she experienced extreme distrust in others, auditory hallucinations, panic attacks, and hot flashes. Self-mutilation had begun at age 16 and had last occurred a year earlier to "[e]ase the stress." Plaintiff was at that time living with her two oldest children in the home of a male friend. Through questioning by her attorney, Plaintiff recalled the removal of her children by CPS in November of 2011 due to unsanitary living conditions and unhealthy parenting skills. She also testified to being fired from the one paying job that she had for arguing with her supervisor and not showing up for work on time. Even before that, she did not follow job-related commands, avoided contact with and yelled at customers, and was generally unfriendly toward co-workers. Since then, Plaintiff had allegedly applied for several fast food jobs but had not gotten a "call back." The two daughters who lived with Plaintiff received counseling for ADD and ADHD. Plaintiff testified that she possessed a driver's license but did not drive because she had no car. Even if that were not the case, she tended to avoid driving on highways.

When school was in session, Plaintiff would typically see her daughters off to school and then sleep for most of the day or watch TV, mainly cartoons. She assisted with homework as best as she could but frequently became frustrated with the children's proficiency. Most of the cooking was done by Plaintiff's friend as she was likely to forget food items on the stove. She had to be reminded to do routine housekeeping, her friend accompanied her when grocery shopping, and she had no bank account. Plaintiff testified that she routinely experienced feelings of guilt and worthlessness, was easily distracted, and had frequent anger outbursts. She did take two college courses online that she was barely passing. Plaintiff had previously failed nursing courses she had taken at a community college

as she had difficulty showing up on time for class.  She needed to be reminded to take her medication.  Plaintiff further testified that she did not get along with family members or neighbors but she did have a number of out-of-town childhood friends whom she communicated with from time to time over the phone.  However, the only local friend whom she had was her roommate, Johnny Chapman.  Plaintiff testified to constant paranoia that others may take her children away or that she would get raped again.  She thus did not attend church, participate in group activities, or otherwise interact with others.  Plaintiff was also reminded of the previous incident in which she reportedly had tried to stab her mother.  (Tr. pp. 54-95).

Plaintiff's friend and roommate, Johnny Chapman, was the next witness to take the stand.  He testified that Plaintiff had lived with him for almost two years and that she required constant reminders from him to take her medications or to perform simple tasks such as warming food on the stove.  Chapman testified although Plaintiff had some interactions with her children, they preferred to be with him and that he did the bulk of the cooking, laundry, and other household chores.  When Plaintiff did not take her medications she would become moody, irritable, and non-communicative.  Having known Plaintiff since she was a child, Chapman testified that she changed considerably after being subjected to the sexual and physical abuse in her teenage years.  Since moving in with Chapman, there had not been a day when she was alone in the home and he had grave reservations that she could care for herself and her children on her own.  (Tr. pp. 95-102).

The medical records discussed above constitute but a small portion of the voluminous administrative proceeding below, numbering some 2,179 pages in all.  The totality of those records clearly paint the rather sobering picture of an individual who:

- as a child, was the victim of sexual and physical abuse at the hands of multiple abusers, including members of her family;

- has, beginning at age 16, attempted suicide at least six times;

- experienced numerous psychiatric hospitalizations, at least one of which was involuntary;

- by the time she turned 21, had borne three children by three different fathers, each of whom was subsequently removed from her care by CPS due to unsanitary and deplorable living conditions, and only two of whom were returned to her custody after a roughly two-year period and despite ongoing counseling and therapy;

- has continued to engage in a range of risky and inappropriate behaviors, including an alarming numbers of accounts of resorting to self-mutilation as a means of coping with stress;

- has a history of paranoia, hallucinations and hearing voices; and

- was rated by attending social workers as socially isolated and having severe impairments in ADL skills, independent living skills, parenting skills, interpersonal skills and family dynamics.

Although the voluminous medical records noted above pre-dated Dr. Fowler's one-time consultative evaluation, the vast majority of them had not been provided to him for his review. Those records are clearly positive for all but one[5] of the medical findings enumerated in Listing 12.04(A), none of which were even mentioned by the ALJ.

---

[5] The only finding not clearly implicated is Listing 12.04A(1)(d) – "Psychomotor agitation or retardation."

While the ALJ touched upon at least some of the records in assessing Plaintiff's residual functional capacity to work (tr. pp. 19-20) when making his paragraph "B" findings at step three of the §§404.1520/416.920 analysis, he appears to have relied exclusively on a portion of Dr. Fowler's report that was simply a recordation of what Plaintiff related to him. *See*, e.g., *Paul v. Colvin*, No. 12-CV-0130, 2013 WL 1294666 at *23 (N.D. Tex. Mar. 14, 2013), *adopted*, 2013 WL 1286198 (N.D. Tex. Mar. 29, 2013).  Contrary to what the ALJ concluded in the Listing 12.04(B) domain of activities of daily living, the medical records establish – and the hearing testimony fully supports – *significant* difficulties with self-care, cooking, and shopping.  To cite Plaintiff's provision of "… care for her children" as evidence of only a mild restriction in the activities of daily living, when all three of those children had been removed from her home by CPS for approximately two years, strikes the Court as implausible.  The longitudinal medical evidence discussed above, which given the chronic nature of Plaintiff's mental impairments is superior to Dr. Fowler's one-time consultative evaluation, also establishes significant difficulties in social functioning even at a time when she was receiving psychiatric care and counseling on a regular and continuing basis.

All of this brings the Court to the question of remedy.  The Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. §405(g).  "Remand is permissible under 42 U.S.C. § 405(g) only where there has been a 'showing that there is *new* evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'"  *Rodriguez v. Barnhart*, 249 F.Supp.2d 210, 215 (E.D.N.Y. 2003) (emphasis added).  On the other hand, a

decision to direct the Commissioner to award benefits should be made only when the administrative record in the case has been fully developed and when substantial evidence on the record as a whole indicates that a claimant is entitled to benefits. When faced with such a case, it is unreasonable for the court to give the ALJ another opportunity to consider new evidence concerning the disability because the administrative proceeding would result only in the receipt of benefits.[6]

This is such a case.

While the Court is mindful of its duty is to refrain from making its own *de novo* determination or reweighing the evidence,[7] that duty is limited by the concepts and authority discussed above. With that authority in mind and based on a thorough review of the record, this Court is convinced that substantial evidence on the record establishes that the claimant is entitled to benefits and that remand would be the inappropriate on this record, save for calculation of benefits.

## **RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the District Judge issue an order awarding benefits to the Plaintiff and that the matter be remanded to the ALJ solely for calculation of benefits based on a disability onset date of July 1, 2009.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such

---

[6] *Id.*

[7] *See Herrington v. Astrue,* No. 08-CV-3204, 2010 WL 816650 at *9 (S.D. Tex. Mar. 4, 2010); *Moore v. Barnhart*, No. 03-CV-0469, 2004 WL 3237347 at *6 (E.D. Tex. Dec. 8, 2004).

consequences will result from a failure to object.  *Douglass v. United States Auto. Assoc.*, 79

F.3d 1415 (5th Cir. 1996)(en banc).[8]

     New Orleans, Louisiana, this __5th__ day of _____ December _____, 2017.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[8] *Douglass* referenced the previously-applicable 10-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.